## CHICAGO, INDIANAPOLIS & LOUISVILLE RAIL-WAY COMPANY v. WOODWARD.

[No. 20,418.   Filed November 29, 1904.   Rehearing denied March 14, 1905.]

1. CARRIERS.—*Shipment to Point Beyond Line.—Choice of Routes.—Common Law.*—A carrier who agrees to transport freight to a point beyond its own line, in the absence of a prescribed route designated by the shipper, may select any usual or reasonably direct and safe route after reaching its terminus or usual point of departure from its own line.   p. 363.

2. SAME.—*Liability of Initial Carrier.*—In the absence of a special contract the initial carrier is liable only while the shipment is in its custody, and is not liable for the acts of the connecting carrier.   p. 363.

3. SAME.—*Special Contract to Deliver at Destination.*—A railway company has the right to make a contract to deliver property at a point beyond its own line, and for a failure to perform such duty it is liable, the connecting carriers in such case becoming the agents of the initial carrier for such transportation and delivery.   p. 363.

4. SAME.—*Condition of Property at Destination.—Presumption.*—Where property is delivered in good condition by the initial carrier to a connecting carrier and delivered in bad condition at the destination by such connecting carrier, the presumption is that the injury was caused by such connecting carrier.   p. 364.

5. TRIAL.—*Instructions.—Carriers.—Liability.—Burden of Proof.*—The burden of proof of showing a legal excuse for injuries received during transit of cattle delivered in good condition to a carrier and by such carrier delivered in bad condition to the consignee is upon the carrier, since such carrier has almost exclusive means of knowledge.   p. 365.

6. CARRIERS.—*Live Stock.—Injuries.—Elements of Damages.*—Where live stock is delivered to the carrier in good condition for market and delivered at the destination in unfit condition, the owner has the right to feed and care for such stock a sufficient time to cause it to be marketable, and charge such cost, together with the depreciation in market value, to such carrier.   p. 367.

7. CONTRACTS.—*Carriers.—Delivery.*—Where the evidence shows that plaintiff consigned live stock to a commission merchant at I.; that defendant owned a continuous line to I.; that there was also a shorter route thereto; that no direction was given by plaintiff as to route; that plaintiff expressed a desire that the stock should be delivered on the evening after shipment and the agent answered that they should

be, the question as to whether there was a contract for delivery at I. was for the jury.   p. 368.

From Clinton Circuit Court; *Joseph Claybaugh,* Judge.

Action by Hal Woodward against the Chicago, Indianapolis and Louisville Railway Company. From a judgment for plaintiff, defendant appeals. Transferred from Appellate Court under §1337u Burns 1901, Acts 1901, p. 590. *Affirmed.*

*E. C. Field, H. R. Kurrie* and *Guenther & Clark,* for appellant.

*J. C. Farber* and *B. F. Ratcliff,* for appellee.

HADLEY, J.—Appellee sued appellant to recover damages for failure to transport and deliver live stock at place of destination in a safe and sound condition.

South Raub is a village situate twelve miles south of LaFayette. Appellant owns and operates a railroad running through Raub and LaFayette, thence in a northerly direction to Monon, forty miles north of LaFayette, where it intersects appellant's other railroad running from Chicago in a southeasterly direction to Indianapolis; appellant thus having a continuous railroad from Raub to Indianapolis. The Big Four has a railroad running direct from LaFayette to Indianapolis, and the distance from Raub to Indianapolis *via* LaFayette and the Big Four is seventy miles shorter than *via* Monon and appellant's continuous track, and requires four hours less time, by freight-train, to make the journey. On July 4, 1901, appellee, by his agent William Neaville, loaded thirty-nine fat steers, in a sound and good condition, into two of appellant's cars at Raub, and, as alleged in the complaint, under an agreement that the cattle were to be safely transported to Indianapolis, and delivered to Neaville, Elliott & Johnson in a good and sound condition for market on July 5. The cattle arrived at their destination about 6 o'clock the following morning, July 5. Only thirty-eight animals were delivered to the consignees,

and these were in an enfeebled and bruised condition, which rendered them unfit for market. It required until July 8, or three days of rest, feed and care, to render them fit for market, and then the market had declined, and the animals become reduced in weight, all to the plaintiff's damage, etc. Under appellant's general denial there was a judgment for appellee for $293. So far as the record discloses, the shipping contract was in parol. There was no direction by the shipper as to the route of shipment, and no limitation of the carrier's common-law liability.

The first claim of appellant's counsel is that the company should have had judgment upon the answers to certain interrogatories propounded to the jury, notwithstanding the general verdict in favor of appellee.

The special findings relied upon by appellant as entitling it to the judgment are these: Neaville gave the only shipping directions, which were that the cattle were consigned to Neaville, Elliott & Johnson, at Indianapolis, Indiana. At that time Neaville was advised by appellant's agent that the cattle were to go from LaFayette *via* the Big Four. From LaFayette *via* the Big Four was the ordinary and usual route for the shipment of live stock from Raub to Indianapolis. The cattle were loaded about 9 o'clock a. m., and carried north on the first train after loading, which arrived at LaFayette on time. The cattle were carried in the first train that left LaFayette for Indianapolis after they were loaded, which train was late, and left LaFayette at 4:30 o'clock p. m. There was no other route by which the cattle could have been forwarded by which they could have reached Indianapolis earlier than they did. None of the injuries complained of were inflicted before the cattle were delivered to the Big Four, and their value was not reduced by anything that happened to them before their delivery to the Big Four. The appellant was left free to select the route by which the cattle should be forwarded from LaFayette to Indianapolis. Appellant's own line to

Indianapolis *via* Monon was a much longer, an indirect, and unusual route for the shipment of live stock from Raub to Indianapolis. To carry the cattle safely and without unavoidable delay to LaFayette, and there deliver them to the Big Four, was not all of the agreement on the part of appellant. There were no special findings concerning the vicissitudes of the cattle while in the hands of the Big Four.

The contention of appellant rests in the theory that its carrier's liability existed only during the transportation of the cattle over its own road from Raub to LaFayette, and their delivery to the Big Four at the latter place. If this contention is sustained, appellant was entitled to judgment in its favor, for it is clear from the special findings that the cattle had suffered no injury or depreciation in value from shipment when turned over to the Big Four at LaFayette.

1.   We concede the rule of the common law to be that, in cases where property is delivered to a carrier to be transported to a point beyond the initial carrier's line, the failure of the shipper to designate in the contract of shipment the particular line by which the property shall be forwarded is held fully to authorize the first carrier to select any usual or reasonably direct and safe route after reaching the terminus, or usual point of departure from its own line. *Snow* v. *Indiana, etc., R. Co.* (1887), 109 Ind. 422-425.

2.   Moreover, in the absence of a special contract, where it is thus necessary for a carrier to deliver the shipment to another before the point of destination is reached, the liability of the first carrier ceases when it has safely and without unreasonable delay carried and delivered to the second. *United States Express Co.* v. *Rush* (1865), 24 Ind. 403; *Pittsburgh, etc., R. Co.* v. *Morton* (1878), 61 Ind. 539, 573, 28 Am. Rep. 682; *Lake Erie, etc., R. Co.* v. *Condon* (1894), 10 Ind. App. 536; *Pennsylvania Co.* v. *Dickson* (1903), 31 Ind. App. 451, and authorities collated.

3.   Under the facts of this case, appellant was doubtless justified in forwarding the cattle from LaFayette *via* the

Big Four. But this does not meet the question before us for decision. The complaint proceeds upon the theory that appellant undertook by special agreement safely to carry and deliver the cattle at Indianapolis in a good and sound condition, and was left at liberty to choose for itself the route by which it would reach the destination. The power of appellant to make such a contract is no longer within the limit of reasonable controversy. The overwhelming weight of authority now holds to the doctrines that, in the absence of statutory or charter disability, a common carrier may contract for the safe carriage and delivery of property at a destination beyond its own line, and render itself liable for loss, injury or delay on the line of another carrier, over which a part of the transportation is performed. In such instance the second becomes the agent of the first carrier. *Cummins* v. *Dayton, etc., R. Co.* (1882), 9 Am. and Eng. R. R. Cas. 36; See large number of cases collated in 6 Cyc. Law and Proc., 481; 6 Am. and Eng. Ency. Law (2d ed.), 631.

4. Under the averments of the complaint it was competent for appellee to prove that appellant by the shipping contract affirmatively undertook safely to carry and deliver the cattle to the consignees at Indianapolis. If he succeeded in making such proof, it was sufficient to charge appellant with any loss or damage to the cattle, whether it accrued while in the care and custody of appellant, or in the care and custody of the Big Four, its chosen agent. The jury specially found that it was not all of appellant's contract safely to carry and deliver the animals to the Big Four at LaFayette, and we must presume, in support of the general verdict, that the further part of appellant's contract was safely to carry and deliver to the consignees at Indianapolis, as alleged in the complaint. And since the special findings are silent concerning the condition of the cattle when they arrived at Indianapolis, and concerning their treatment and freedom from loss or injury while in the care and custody of the Big Four, we must further presume, in

aid of the general verdict, that the loss and injuries complained of, and found by the jury to exist, resulted to the animals while in the hands of the latter company. *City of South Bend* v. *Turner* (1901), 156 Ind. 418, 423, 83 Am. St. 200; *Wright* v. *Chicago, etc., R. Co.* (1903), 160 Ind. 583, 589. The court did not err in overruling appellant's motion for judgment on the answers to interrogatories.

5. Appellant further complains of the giving of instructions numbered one, two and four, requested by the plaintiff. The matter assailed in the first two is, in substance, that the burden was on the plaintiff to show by a preponderance of the evidence that the cattle were delivered to the defendant at Raub in good condition, and delivered to the consignees at Indianapolis in a bad and injured condition, and if it was thus shown by the evidence that there were thirty-nine head delivered to the defendant by the plaintiff, as averred, and they were in a good, sound condition when delivered, and that there was unreasonable delay in the transportation of the same, and that the cattle were delivered at Indianapolis in an injured condition, then, to avoid liability, it became incumbent upon the defendant to show by a preponderance of evidence a reasonable excuse for any such delay and injuries, and for any shortage in the number received. Appellant's counsel concede that these instructions properly stated the rule relating to inanimate or dead freight, lost or injured by a carrier in its transportation, but they insist that it does not apply to live stock, which is possessed with inherent power and propensities to injure itself and each other when confined and in a state of frenzy in a moving freight-car.

According to the well-established rule, a common carrier is liable for any loss or injury to property intrusted to it for transportation, unless it is able to show that the loss or injury was caused by the act of God, the public enemy, or that it resulted from the inherent nature of the thing itself, as by the natural decay of fruits, vegetables, ice, fresh meats

and other perishable property and the like. And it is equally well established that railroad companies are common carriers of live stock with the same imposed duties and responsibilities that exist at common law relative to the carriage of goods, except that they are not to be held liable for losses and injuries resulting from the natural disposition and exertion of the animals themselves. In short, it may be said generally that a carrier, when free from negligence, is liable for no loss or injury from causes over which it had no control. 6 Cyc. Law and Proc., 381, and authorities cited.

But the question is, since it is shown that the cattle were delivered at their destination, reduced in number and in an injured condition, which party has the burden of establishing the cause of injury—the shipper or the carrier? It will be remembered that appellant received the cattle for transportation without any limitation of its common-law liability, and without the shipper's assuming any of the hazards of shipment. Appellant thereby incurred the general obligation of the common carrier safely to carry. The loss and injuries suffered might have happened from the natural propensities of the animals, and without fault on the part of the carrier, or they might have happened from accident, or from the negligence of the carrier. Under the shipping arrangement, neither the shipper nor his agent was required or permitted to accompany and care for the cattle. The shipper had not equal means of knowledge with the carrier as to the cause of injury. There is therefore in such a case strong reason and almost universal precedent for laying upon the carrier the onus of bringing the cause of injury within one of the excusatory exceptions recognized by law. *Lindsley* v. *Chicago, etc., R. Co.* (1887), 36 Minn. 539; *McCoy* v. *Keokuk, etc., R. Co.* (1876), 44 Iowa 424; *Toledo, etc., R. Co.* v. *Durkin* (1875), 76 Ill. 395; *Evans* v. *Fitchburg, etc., R. Co.* (1872), 111 Mass. 142; *Dow* v. *Portland Steam Packet Co.* (1892), 84 Me. 490; *Railroad*

*Co.* v. *Wynn* (1890), 88 Tenn. 320; *Kinnick* v. *Chicago, etc., R. Co.* (1896), 69 Iowa 665; 5 Am. and Eng. Ency. Law (2d ed.), 469; 6 Cyc. Law and Proc., 383. The cases cited by appellant are not authorities in a case like this. And in cases where special contracts are made limiting the carrier's liability, or stipulating that the shipper shall accompany the stock, and the like, a different rule generally prevails. . The court did not err in giving the first and second instructions requested by the plaintiff.

6. By number four of the instructions complained of, the jury were told that in estimating the plaintiff's loss and damage, if any were shown, they should take in consideration all items of expense in keeping, feeding and caring for the cattle while being put in fit condition for market, and of shrinkage and depreciation, if any shown, in their market value. Appellant claims that the true measure of damages was the difference in the market value of the cattle at the time of arrival at destination and at the time they should have arrived, less the freight. This is a strange argument for appellant to make, in view of the fact that it was clearly shown that the cattle were, on the day of their arrival at Indianapolis, from exhaustion, in an unsalable condition for food. To have been tested by the market for condemned animals would have proved disastrous to the defendant. But by being treated as food animals, or rather as possesing the elements of recuperation and restoration to food animals, which could be attained, and the same made marketable in a short time and at small expense, and which, as the evidence shows, was accomplished within three days, and at an expense of $25 or $30, and the cattle then sold for beef at a price within a small fraction per pound of the price brought by animals of the same class on the day of arrival—makes it very clear that the instruction was beneficial to the defendant. Having received the benefit of the sale of the animals for food, no question can be made that the expenses incurred in their

preparation and their consequent shrinkage were proper elements of plaintiff's damage. *The Caledonia* (1895), 157 U. S. 124-139, 15 Sup. Ct. 537, 39 L. Ed. 644.

We find no error in the record. Judgment affirmed.

## On Petition for Rehearing.

Per Curiam.—7. Complaint is made that we did not rule upon the sufficiency of the evidence to establish a special contract for the safe delivery of the cattle to the consignees. at Indianapolis. Such a contract was specifically averred in the complaint. It was a triable issue, and a question of fact for the jury. The jury decided it against the appellant. There was evidence that the cattle were consigned to Neaville, Elliott & Johnson at Indianapolis; that appellant had a continuous line of railroad from Raub to Indianapolis; that there was a shorter and usual route by way of LaFayette and the Big Four; that no direction whatever was given by the shipper as to which route should be traveled in reaching Indianapolis; that the shipper expressed a desire that the cattle should be in Indianapolis that evening, and appellant's agent answered that they should be there; and from these and other proved facts the jury had reasonable grounds to infer a special contract, and whether sufficient to establish such contract was for the jury, and not us, to decide. We can not weigh the evidence.

Petition for rehearing overruled.